## Newman *v.* Doe *ex dem.* Harris & Plummer.

A transcript of the registry of names, kept by the United States agent, of the application of Choctaw Indians to become citizens, under the provisions of the treaty of cession, is admissible in evidence without first showing, that, the names were names of Choctaw heads of families. The presumption must be, that the agent complied with the requisitions of the treaty, so far as the powers of his office extended.

Application to become a citizen under the fourteenth article of the treaty of Dancing Rabbit Creek, by letter to the United States agent, designating particularly the lands claimed under the treaty, is a sufficient notification of intention to claim the benefit of the treaty, and become a citizen; and such letter, together with the certificate of application, and location by the agent of the United States, are admissible in evidence to prove the identity of the land claimed.

Where the original application and certificate of location are in the custody of the Department for Indian affairs, and beyond the control of the claimant, copies certified by the proper officer are admissible in evidence, in an action of ejectment.

Parol evidence, that the officer was acting as government agent under the treaty, is sufficient, without the production of his appointment.

Where an Indian released to a state his rights to Indian citizenship, but the United States subsequently treated with him as an Indian, and allowed him a reservation of land as such, it was held that such relinquishment of citizenship did not affect his title to the land acquired under the treaty, and could not be inquired into in an action of ejectment; it being a matter between the Indian and the general government.

The fourteenth article of the treaty, which provides, that each Choctaw, the head of a family, who wishes to remain and become a citizen, shall have that privilege, by signifying his intention to the United States agent within six months from the making of the treaty, and that, he shall be entitled to certain reservations of land, and that, if he reside upon the land, intending to become a citizen of the States, for five years after the ratification of the treaty, a grant in *fee simple* shall issue, is equivalent to a grant with a condition subsequent. In order to complete the grant, it is necessary that the Indian should have resided five years on the land; and parol proof is competent to establish residence.

An official certificate is evidence, only so far as the matter certified comes within the official duty or cognizance of the officer.

It is not necessary, that the Indian should have had a residence, or improvement on the land, at the time of the ratification of the treaty, in order to entitle him to a reservation. It seems that it is sufficient, if his residence commenced within six months of that time.

The reservation should be located in one body, according to sectional lines; but it appears that if a different location be recognized by the government before other rights accrued, it will hold.

ERROR from the circuit court for the county of Bolivar.

Trial before the Hon. F. W. HULING.

This was an action of ejectment commenced in the circuit court of Bolivar county, by Harris & Plummer against John V. Newman. The declaration contained two demises, both made on the 1st of December, 1835, one in the name of Hugh Foster, and the other in the name of Harris & Plummer. Hugh Foster, as the head of a Choctaw family, claimed the land in controversy, as a reservation by virtue of the treaty of Dancing Rabbit Creek, made in 1830, and Harris & Plummer claimed title by deed from Foster, bearing date the 4th of December, 1834.

John V. Newman, the defendant, claimed title by virtue of a location made by Jefferson College, under an act of Congress of the 20th of April, 1832. By this act, Congress granted certain lands to Jefferson College, with a right to locate and dispose of the same for the benefit of the College. In conformity to the law, the College assigned to Pearce Noland twelve hundred and eighty acres, which embraced the land in controversy, which was described in the grant to Noland, as lots one, two, seven, eleven, twelve, and thirteen, of section thirty-one, and the entire sections No. thirty-two and thirty-three, the north half of section No. twenty, the west half of north-west quarter of section No. nineteen, and lots four and ten of section No. thirty-four, in township No. twenty-two, of Range No. eight, west, in the district of Chocchuma. The grant was direct to Noland from the Register of the land-office, in conformity to law, and bore date the 21st of October, 1833.

It appeared that Foster was registered by the government agent as an applicant for citizenship, previous to the 24th August, 1831.

It was stated in a letter, (which was read to the jury,) addressed to the Secretary of War by a member of Congress from this state, dated Sept. 16th, 1834, that application was made by Foster to the locating agent for his reservation, in October, 1833. The written application of Foster for the land, and the designation of it by the locating agent, bore date the 3d December, 1834.

It was in proof that Foster settled his reservation in 1830; but evidence was offered on the part of the defendants below to prove that he voluntarily abandoned his reservation before the expira-

tion of five years, which was rejected by the court, and exceptions taken.

During the progress of the trial, the defendant below presented eight bills of exceptions, which present the facts and questions arising upon the trial in their order.

The 1st bill of exceptions tendered and signed by the court was to the opinion of the court in admitting the registry of Choctaw names, kept by Ward, United States agent of the applications of Choctaws to become citizens, dated 24th August, 1831, because it did not show that the names were the names of Choctaw heads of families, and because it did not show that Ward was U. S. agent.

2d bill of exceptions was to the admissibility in evidence to the jury, of the copy of a letter, dated December 3, 1834, from Hugh Foster to Col. Geo. W. Martin, claiming and designating the land, and the endorsement of application and designation thereon by said Martin, upon the ground that it was inadmissible, and that it was the copy of a private letter, and was no part of a record that could be made evidence for the lessors of the plaintiffs, having been written by the plaintiff himself, and to the admission of the copy of a letter from Elbert Herring to Geo. W. Martin, and to a copy of a letter from F. E. Plummer, designating the land claimed.

3d bill of exceptions was to the admission of a witness, and to his evidence to prove that Geo. W. Martin was the acting locating agent of the United States government for locating the reservations of the Choctaws under the treaty of Dancing Rabbit Creek, on the ground that it was not the highest evidence, and that the same could not be proved by parol.

4th bill of exceptions was to the opinion of the court in ruling out and in refusing to permit the defendant's counsel to read to the jury an act of the legislature of the state of Mississippi, granting to Hugh Foster certain privileges upon his relinquishing by deed all his Indian privileges, to wit: "an act entitled an act for the relief of the children of Moses Foster, of Claiborne county, approved February 10th, 1821."

5th bill of exceptions was to the opinion of the court in ruling out and in refusing to permit the defendant's counsel to read in evidence to the jury, a certified copy of the record of relinquish-

ment of Hugh Foster *et al.* from the county court of Claiborne county, of all their Indian privileges in the year 1826, prior in date to the treaty of Dancing Rabbit Creek.

6th bill of exceptions was to the opinion of the court in ruling out the evidence of ·Orien Kingsby, introduced by the defendants to prove that Hugh Foster had voluntarily removed from his residence and improvement before the expiration of five years after the ratification of the treaty of Dancing Rabbit Creek, to avoid a prosecution for felony, and that he did not reside upon said lands for the space of five years after the ratification of said treaty, and in refusing to permit said testimony to be given to the jury.

7th bill of exceptions was to the fifteen following charges given by the court to the jury, to wit:

That by the 14th article of Dancing Rabbit treaty, a grant is made to each Choctaw head of family who signified his intention to the Choctaw agent, within six months from the ratification of the treaty, of his desire to remain and become a citizen of the State, had vested in him a title to 640 acres of land for himself, and a quarter section for each of his children living with him under 10 years old; that upon such registration or signification of his said intention, it was the duty of the locating agent before the land was sold, in the neighborhood of his improvement, if he had one, to locate said Indian's reservation. If the Indian had no improvement to locate it on, it should be on any unappropriated land that the Indian or his agent should designate. That for the Indian to have his right reserved by the treaty before the land was offered at public sale, he should either tender a location to the Choctaw agent, or to locate or designate the spot he desired to take for his reserve, by some improvement or claim well known or notorious in the neighborhood of the land intended to be located, or he will lose his rights. The court then gave the following instructions, by the plaintiff's request. ·.

1. That if the jury believe from the evidence that Hugh Foster was the Choctaw head of a family and signified his intention to the agent to become a citizen of the States within six months after the ratification of the treaty of Dancing Rabbit creek, he was entitled to a reservation of 640 acres, and if they believed he had a family of four children, at the ratification of the treaty, un-

der 10 years of age, he is entitled to a further reservation of 640 acres.

2. That the registry of his name by the agent, within six months after the ratification of said treaty, is sufficient evidence of his being the Choctaw head of a family.

3. That if the jury believe from the evidence that Hugh Foster selected or designated his said reservation previous to the location of the Jefferson College float, it vested in him the elder legal title, and it was not necessary for him to make such selection or designation by specific metes and bounds.

4. Improvement on part of the land before the ratification of said treaty, and a notice or warning to others that he had selected the land in controversy, before the laying of the College float, as his reservation, was a sufficient selection or designation of his said reservation, and vested in him the elder legal title, under the 14th article of said treaty.

5. That the subsequent specific location or designation in the year 1834, by the locating agent, did not in itself vest the legal title, but only marked out by proper metes and bounds said reservation, which had already legally vested.

6. That the legal title in the Choctaw head of a family was vested, by virtue of the 14th article of said treaty, when he registered his name with the agent and signified his intention to become a citizen of the States, and no patent was ever necessary to vest title.

7. That the 14th article of the said treaty vested in the Choctaw head of a family to reservation for him and in right of his children upon his signifying his intention to the agent, within proper time, of remaining and becoming a citizen of the States, and a survey, by the government, of reservation for him at any time within five years after the ratification of the treaty, was sufficient to vest in him the legal title at the time he signified such intention to the agent.

8. That the treaty does not require positively the reserved lands of the Choctaw head of a family to be adjoining or contiguous to each other, but only those in right of the children to adjoin the reserved land of the parent.

9. That if the government surveyed or located reservations for

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

the Choctaw heads of families at any time within five years after the said reservees had signified their intention to the agent to remain and become citizens of the States, the legal title to said reservations vested from the time of signifying said intention, although other locations by white citizens of the United States had been made on said reservations, or part of them ; that the delay of the government to make such survey shall not affect the Indian's right.

10. That when any reasonable doubt shall arise in the construction of this treaty, it shall be construed most favorable to the Choctaws.

11. That the elder legal title shall prevail in an action of ejectment.

12. That the treaty of Dancing Rabbit creek took effect from the date of its ratification, and was binding only from that period, and that all its requisitions and grants under the 14th section take effect at that time.

13. That the endorsement of the agent, Geo. W. Martin, on the part of the government, is conclusive evidence that the reservation of said Hugh Foster, as specified in his application, was in pursuance of and according to the terms of the treaty, and that it sufficiently specifies said land as the land to which said Foster was entitled, under the 14th article of the treaty, and that said Foster was entitled to all the lands specified in said application.

14. That if Hugh L. Foster made any settlement, or claimed any improvements, or made any designation, known in the neighborhood previous to the issuing of the College certificate, that is previous to 21st October, 1833, the title of Foster is elder than the title under the certificate, provided the jury find such designation or call, to be included in any part of his reserve as now claimed.

8th bill of exceptions was to the opinion of the court in overruling, and refusing to give the 2, 3, 4, 5, 6, 7, 8, 10, 12, 14, 15, 16, 17, 18, 19, 21, 23, 24, and latter part of the 20th charges to the jury, prayed for by the defendant's counsel, and which were as follows, to wit:—

2. That unless the jury believed from the testimony that Hugh Foster resided upon the land, in the declaration mentioned, on

or before the 25th day of February, 1831, they must find for the defendant.

3. That unless the jury believed from the testimony that Hugh Foster resided upon the lands in the declaration mentioned, at the date of the treaty of Dancing Rabbit Creek, to wit: on the 27th of September, 1830, they must find for the defendant.

4. That unless the jury believed from the testimony that Hugh Foster had an improvement on the land, in the declaration mentioned, on or before 25th February, 1831, they must find for the defendant.

5. That unless the jury believed from the testimony that Hugh Foster had an improvement on the land, in the declaration mentioned, at the date of the treaty of Dancing Rabbit Creek, to wit: 27th September, 1830, they must find for the defendant.

6. That unless the jury believed from the testimony that Hugh Foster had an improvement on the land, in the declaration mentioned, on or before the first day of December, 1833, they must find for the defendant.

7. That unless the jury believed from the testimony that Hugh Foster resided on the land in the declaration mentioned, on or before the first day of December, 1833, they must find for the defendant.

8. That unless the jury believed from the testimony that Hugh Foster applied to the proper officer of the government of the United States, on or before the date of the certificate of location to *Pearce Noland*, assignee of Jefferson College, to wit: the 21st of October, 1833, to have his, the said Foster's reservation located on such of the lands in the declaration mentioned, as the defendant is proven to have been in possession of, at the time of the service of the copy of said declaration, upon said defendant, and if the jury believe from the testimony that the lands in the said certificate mentioned, include the said lands, of which the defendant was proven to have been in possession of, as aforesaid, and that Hugh Foster never resided upon, or had an improvement upon the same, they must find for defendant.

10. That if the jury believed from the testimony that Hugh Foster was entitled to fractional section, No. 7, as a reservation, and that none of the other lands in the declaration mentioned,

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

adjoin said section 7, and that the defendant was not in possession of said section 7, at the commencement of this suit, or at the time of the service of the declaration upon him, they must find for the defendant.

12. That the Choctaw head of a family entitled to a reservation under the fourteenth article of the treaty of Dancing Rabbit Creek, had no legal title to any part thereof, except the section on which was his improvement, or a part of his improvement, until the reservee, or the proper officer of the United States, had done some act locating or designating said reservation.

14. If the jury believe from the testimony that Hugh Foster did not reside upon said lands for five years after the ratification of the treaty of Dancing Rabbit Creek, and that he voluntarily abandoned the same before the expiration of said five years, and unless the jury believe from the testimony that a grant has issued to him for said lands, they must find for the defendant.

15. That the treaty of Dancing Rabbit Creek, vested in Hugh Foster no legal title to any lands, except one section, bounded by sectional lines of survey, and vested in him only an equitable title to the remainder of the lands, to be included in his reservation.

16. That unless the jury believed from the testimony, that section 7, of the lands in the declaration mentioned, did at the time of the original survey of said lands by the surveyor of the United States, or at some subsequent period, adjoin some of the other lands mentioned in said declaration, that the said Hugh Foster had not a legal estate by virtue of the treaty, in both said section 7, and in said other lands, and in that case, unless the jury believed from the testimony, that said Foster, or the other lessors of the plaintiffs have acquired a legal title to the same, and unless the jury believed from the testimony, that the defendant was in possession at the commencement of this suit, of some part of the land, to which the said Foster or the other lessors, had the legal title, they must find for the defendants.

17. That to so much of the reservation of Hugh Foster as he was entitled to for his children, he had no legal title vested in him by the treaty or by his registration, and unless he or the other les-

sors of the plaintiff have acquired a legal title thereto, they cannot recover the same in this action.

18. That the letter of Hugh Foster, and the endorsement of Martin, read in the trial of this cause, is not a location or appropriation of the lands therein named.

19. If the location or appropriation of said lands was made by said letter and endorsement, or at, or after the date of said letter, the legal title of Hugh Foster is younger than that of Pearce Noland.

20. (The court charged that the certificate to Pearce Noland has the force and effect of a patent, from the date thereof.) But refused to charge in connection, that the parol evidence introduced to invalidate the said certificate, or to prove an older legal title, was inadmissible and could not be regarded by the jury.

21. If the jury believe from the testimony, that Hugh Foster had an improvement within the Choctaw boundary, at the time contemplated in the treaty of Dancing Rabbit Creek, that his reservation must include the said improvement, or a part of it.

23. That the reservee under said treaty must take as a reservation, the section upon which his improvement was at the time required by the treaty, unless the same was appropriated to an older or other claim, and the remainder of his reservation must adjoin the said section, unless the adjoining lands are already appropriated, and such facts must be proved to the jury.

24. That if said Foster afterwards applied to have, and did have his said reservation located in a different manner from that which he had declared in the neighborhood by words, and signified by his acts, and so as to include other lands than those first specified, as aforesaid, and that said subsequent location was made after the 21st October, 1833, the legal title of the said Noland is older than that of said Foster.

9th bill of exceptions, was to the opinion of the court in overruling the motion for a new trial, on the following testimony, given to the jury on the trial of the case, before they had retired to deliberate, all embodied in the 9th bill, and signed by the court, to wit:

The plaintiffs first read in evidence, the copy of registry of the

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

Choctaw names set out in the record in the first bill of exceptions. Plaintiffs then read in evidence a copy of the letter from Hugh Foster, set out in the second bill of exceptions, and then produced in court Jennings Jeffers, who deposed that he was acquainted with Hugh Foster, he lived in the Choctaw nation one year before he started to the treaty of Dancing Rabbit Creek, he made a crop in the nation, and was known as an Indian, his mother was an Indian and his father a white man, he had three or four children.    Witness had been at his house at Indian point, helped him move there about the 1st of January of the winter after the making of the treaty, and helped him build a cabin.    That before he removed to Indian point he lived on Black creek, east of Yazoo river; and lived in Copiah county, before he went to Black creek. He made a crop on Black creek; he commenced cutting logs so soon as he went to Indian point, and had his family with him; did not know how many children he had, it was three or four. Did not know their age.    The ensuing fall when witness came up, Hugh Foster was living there; William Foster's place was half a mile below Hugh.    He was a nephew of Hugh and William Foster, and knew Moses Foster, their father.    His children were Alexander, Elizabeth, Peggy, Rebecca, Moses, William, Hugh, James, and Mary.

Plaintiff then introduced Abram Knolton, who deposed: That Hugh Foster came to Indian point last of December, 1830, or first January, 1831, and made an improvement, which was on lands now occupied by Coffee and McKraven.    Hugh Foster claimed up the river.    Foster warned off one Clayton by an order from Col. Ward, the agent of government, to remove all intruders from the nation.    Clayton's place was near the house of Mr. Newman. Hackinbury afterwards purchased Clayton's improvement, and was there in March, 1832.    There was some jarring, and perhaps, some fighting between Hackinbury and Foster.    Mr. Foster came to Indian point in July, 1830, and went away and returned with Hugh and Hugh's family on 1st January, 1831.— Hugh built a camp, and afterwards raised a house.    Hugh always claimed up the river.    William both up and down.    Hugh had four children soon after he built his house.    Hugh was at his improvement until September or October, *1835*; and saw his

family there in January, 1836, but not himself; Hackinbury continued there until Dixon took the possession after November, 1833, of the place where Newman now lives.

Plaintiffs then introduced Uriah J. Longacre, who deposed that Newman was in possession of the lands where he now lives, when he served the declaration, and he had been living there before he came to the country; it was about four miles above Indian Point, and four miles above a point opposite the mouth of Arkansaw. Benjamin Cook was then introduced on the part of plaintiff, who deposed that in 1830, he lived on the Choctaw line on the Mississippi river, three miles below Foster's. Foster came first to his house in the spring of 1830. Said they came to look at the land—they made a selection from the line all the way on the river up to Clayton's. They went away. William returned in June, 1830; made an improvement, and said it was for himself and Hugh. Hugh claimed the improvement of Clayton. Hackenbury afterwards took possession of Clayton's claim. Foster and a man named Musick, had a fight about it. Hackenbury's improvement was about three miles above Hugh Foster's. Hugh removed to the improvement made by William, 2d or 3d January, 1831. William said he was making the improvement there to get reserves. Hugh had four children. Hugh and William said they must soon return to assist in making a treaty. He loaned William money to go to the treaty.

B. M. Hinds was then introduced on the part of plaintiffs, who deposed that the map produced on the trial was a true representation; that he surveyed it; that section 33, on said map, is in possession of defendant; that his house and improvements are on the same; that section 7 is in possession of McKraven, whose quarter is on it, and his gin, three or four hundred yards below the west line of section 7; that section 7 contains fifteen acres of the tract, and 15 acres of it have fallen in the river since the survey.

Plaintiffs then introduced Orin Kingsly, who deposed that Hugh Foster first came to Indian Point on the 5th of January, 1831. Settled on the river one mile above the mouth of Arkansas—his house 150 yards above the gin of McKraven. He had an improvement of five or six acres around his house.

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

Plaintiffs next introduced George B. Wild, who deposed that George W. Martin was acting as locating agent from 1833 to 1837, by report, and by his locating a reservation for an Indian by the name of Colman Coble, which has never been confirmed.

Lot Musick, introduced by the plaintiffs, swore that he lived a mile below where Newman now lives. There was a difficulty between Foster and Hackenbury about the land now claimed by Newman.

Plaintiffs then read in evidence the deed from Hugh Foster to Harris and Plummer, dated 4th December, 1824, on pages 29 and 30, for the lands in controversy.

Defendant then read in evidence to the jury, a grant from the United States to Pearce Noland, dated 21st October, 1833, for the land in controversy. Defendant then introduced Orin Kingsly and Bradly Alister, who deposed that Hugh Foster resided in Copiah, in 1828, and had formerly resided in Claiborne county. William never had any children.

Thrasher, for plaintiff in error.

Nine errors have been assigned in this court to reverse the judgment of the court below, though the eighth assignment includes nineteen substantive charges asked for, and refused by the court, and the seventh assignment includes fifteen charges, given by the court, and excepted to by the plaintiff in error. So that in fact, forty-one errors have been assigned by the plaintiff in error for the consideration of this court. Many of these, however, may be considered under the same head, and involve but one and the same principle of law.

The first general principle of law, which is thought to be decisive upon the merits of this case, is, that in the action of ejectment the plaintiff must recover upon the strength of his own title, and not upon the weakness of his adversary's, for whom possession alone is a good right. 2 Bibb, 130. And in order to enable a claimant to support the action of ejectment, he must be clothed with the legal title to the land. No equitable title will avail. Adams on Ejectment, 32. 7 Term Rep. 43, 47. 8 do. 2 and 6 do. 289. 5 Harr. & Johns. Rep. 164. 9 Cowen, 88. 9 Johns. 60. And the principle is so fixed and immutable, that a trustee may

45*

maintain an ejectment against his own *cestui que trust.* Adams on Ejectment, 32. 8 Term Rep. 118, 123. 3 Johnson, 423. 2 Randolph's Rep. 422. This principle would seem to stop the lessors of the plaintiffs, and to form an impassable barrier to their recovery in the very outset of the case; for it is impossible that they could have had any other than an inchoate or equitable title under the broadest rule of construction, even admitting Foster's claim to the land in controversy to be valid according to the provisions of the treaty of Dancing Rabbit Creek. Because the fee or legal title never was vested in the Choctaw nation, and much less in Foster, even before the treaty of Dancing Rabbit Creek, according to the numerous decisions on Indian titles. See 6 Cranch, 87. 9 Cranch, 11. Johnson *v.* McIntosh, 8 Wheaton, 543. 13th Peters, 201.

By the third article of this treaty of Dancing Rabbit Creek, the Choctaw nation, for and in consideration of the previous provisions of the treaty in their favor, ceded to the United States the entire country that they owned east of the Mississippi river, and agreed to remove during the falls of 1831–2 and 3. This cession must be construed to mean their right of occupancy, as they had none other to cede. The 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13th following articles of the treaty contain reciprocal stipulations respecting the Choctaws, and the conduct of the United·States, towards them, in their new homes. The 14th article, however, under which the lessors of the plaintiffs claim, stipulated that "each Choctaw head of a family, being desirous to remain and become a citizen of the States, shall be permitted to do so by signifying his intention to the agent, within six months from the ratification of this treaty; and he or she shall thereupon be entitled to a reservation of one section of 640 acres of land, to be bounded by sectional lines of survey, in like manner shall he be entitled to one half that quantity for each unmarried child which is living with him, over 10 years of age, and a quarter section to such child as may be under 10 years of age, to adjoin the location of the parent. If they reside upon said lands, intending to become citizens of the States, for five years after the ratification of this treaty, in that case a grant in fee simple shall issue. Said reservation shall include the present improvement of the head of the family, or a portion of it."

By the very terms of the treaty, a Choctaw reservee could have only an inchoate or equitable title to the reservation, until he had resided on it five years after the ratification of the treaty, which took place on the 24th February, 1831. If he resided on the land for five years after the 24th February, 1831, then and not until then, could he acquire the legal title. 2d vol. Land Laws, 105. The deed from Foster to Harris & Plummer, bears date the 4th December, 1834, and the demises are laid on the 1st December, 1835, previous to the expiration of five years, at which time it was impossible to acquire the legal title. And that Foster has not since acquired it, is evident from the fact that it does not appear in the record. The testimony of Abram Knolton proves that Foster removed from the pretended reservation, and from the country, in September or October, 1835. So that he never could acquire the legal title, and the conditions upon which he held the inchoate or equitable title, to wit: five year's residence, has been broken by himself, and forfeited. Consequently, the lessors of the plaintiffs have exhibited no title upon which the action of eject-ment can be sustained.

Nothing however is easier, than to show that Foster had no right, as a reservee, even to the equitable title, and was not, in that capacity, entitled to the land in controversy, under the provi-sions of the treaty of Dancing Rabbit Creek; because he never brought himself within the provisions of the 14th article of the treaty, in relation to residence, location, and improvement. The consideration of these points will dispose of the principal ques-tions involved in the assignment of errors. And here it might be well to remark, that as regards construction, it is a universal maxim of the law, that when there is no ambiguity in a statute, it admits of no other construction than that indicated by the literal import of the terms used. Such was the doctrine of the supreme court in the case of Arredondo & Son, 6 Peters, 710. Five things were necessary, under the 14th article of the treaty of Dancing Rabbit Creek, to a valid reservation. 1. That the reservee must have been the Choctaw head of a family, desirous to remain and become a citizen of the states. 2. That he must have signified his intention of the facts to the agent, within six months after the rat-ification of the treaty. 3. That the reservation must be bounded

by sectional lines of survey.   4. That he must reside on the land five years, intending to become a citizen of the States, before he could acquire the legal title.   And 5. That said reservation should inclue "the present improvement of the head of the family, or a portion of it."   If Foster has failed in either of these five requisites, of course his right to the reservation is bad.   In the first place, the record does not legally show that he was the Choctaw head of a family, desirous to remain and become a citizen of the States; nor that he signified his intention of the fact to the agent, within six months after the ratification of the treaty.   The copy of a registry of Choctaw names, set out in the first bill of exceptions, and which was in evidence before the jury, and constitutes the first assignment of error; and the copy of the letter from Hugh Foster to George Martin, and endorsement thereon, set out in the second bill of exceptions and constituting the second assignment of error, were inadmissible to prove these facts.   The registry does not show that the names, were the names of Choctaw heads of families; nor that Ward was United States agent.   The copy of Hugh Foster's letter, was the copy of a private letter and no part of an official record that could be made legal evidence. Nor could it be proved by parol evidence, that Martin was the locating agent of the Choctaws, as attested by the testimony set out in the third bill of exceptions, and forming the third assignment of error.   It was not the highest evidence that the fact admitted of.

The fourth and fifth assignments of error would seem to preclude Foster from becoming a reservee under the 14th article of the treaty, unless especially named as such.   And that the court below erred, in ruling out and in refusing to permit the defendants' counsel to read in evidence to the jury, an act of the legislature of this state, granting to Hugh Foster certain privileges, upon his relinquishing, by deed, all his Indian privileges, as set out in the fourth bill of exceptions, admits of but little doubt.   And that the court erred in ruling out and in refusing to permit the defendants' counsel to read in evidence to the jury, the certified transcript of the record of relinquishment of Hugh Foster *et al.* from the county court of Claiborne county, of all their Indian privileges in the year 1826, as set out in the fifth bill of exceptions, is equally clear.   It certainly was competent for the state to contract

[Newman *v.* Doe *ex dem.* Harris *&* Plummer ]

with Hugh Foster for a relinquishment of his Indian privileges; and having relinquished them to the State, he could not again resume them at pleasure, for the purpose of claiming a reservation by virtue of qualities which he had long since relinquished. The state of Mississippi being a component part of the federal government, and interested in the public domain, did legally contract with Foster to relinquish his privileges as an Indian; and having relinquished them, it was a fraud both upon the state and general government, to attempt to claim a reservation by virtue of his Indian rights and privileges, which he had relinquished to the state.

The fourth and fifth requisites necessary to a valid reservation, under the 14th article of the treaty, are, that the reservation shall be bounded by sectional lines of survey, and shall include the present improvement of the head of the family, or a portion of it. The words, "shall include the present improvement," are imperative, and point to the identical spot of location, and admit of no other. A location elsewhere would be void, for uncertainty.— The reservee must have an improvement; and the reservation must include his improvement, or portion of it, or the provisions of the 14th article of the treaty will not apply, and the grant will be void, for uncertainty. The description of the grant contained in the 14th article of the treaty of Dancing Rabbit creek, describes the "present improvement" as the location of the Indian reservation. To locate it elsewhere would be void, for uncertainty, and parol evidence would be inadmissible to give it identity. The authorities on this point are numerous. 1 Pick. 31; 16 Mass. 86; Sugden's Law of Vendors. 114, 115; 4 Mass. 205; 13 Johnson, 102, 103; 8 Peters, 84; 3 Howard, 230; and such is the principle in relation to all grants. In the case of Sterlis's heirs *v.* McDougal, 2 Marshall, 184, it was decided that an entry purporting to adjoin another must show all the location calls of such other entry. In Meaux *v.* Haggard, 2 Marshall, 407, it was adjudged that an entry containing more location calls than one could not be sustained, unless all the calls were shown. *Vide* McCracken *v.* Church, 1 Marshall, 273; Delve *v.* Marshall 272; Marshall *v.* Saunders, 604; Beall *v.* Houston, 281. And in the case of Todd's heirs *v.* Fry, 4 Bibb, 110, and Ashley *v.* Moore,

148, the court decided that a call for a stream by a name not generally known, was defective and bad. In 7 Wheaton, page 7, the court say, that the most material and most certain calls shall control those which are less material and less certain; and that a call for a material object, as a river, a known stream or spring, or even a marked line, shall control both course and distance.—Thus we see how closely courts adhere to descriptive calls in a grant. "The present improvement" of the reservee is the only descriptive call in the 14th article of the treaty of Dancing Rabbit creek, under which the defendants in error claim. Hence it becomes necessary to inquire whether or not Foster had an improvement on which he resided at the date of the treaty; and if so, whether or not the reservation has been properly located to include such improvement, or a portion of it.

Jennings Jeffers, a witness sworn on the trial, proves that Hugh Foster removed to Indian Point, about four months after the treaty was made, being on the 1st of January next thereafter. Abram Knolton proved that Foster came to Indian Point the last of December, 1830, or 1st January, 1831, and made an improvement. Benjamin Cook proved that Foster moved to Indian Point the 2d or 3d of January, 1831, more than three months after the date of the treaty. Orin Kinsly swears, that Foster first came to Indian Point on the 5th of January, 1831. All the testimony, however, goes to establish the fact, that at the date of the treaty, Hugh Foster resided on Black Creek, and did not remove to Indian Point for at least three months after the date of the treaty, and that he then, for the first time, made his improvements; and it would be a most singular construction of the treaty, to make the words, "present improvement," apply to a future improvement made three months afterwards at a different point. As it regards this future improvement, however, the only testimony in relation to its location, (and which is conclusive,) establishes the fact, that it was one mile above the mouth of Arkansas river: that Foster's house was 150 yards above McCraven's gin, and that the improvement consisted of five or six acres of land around the house, and never extended 150 yards above the house. B. M. Hinds, the surveyor, proves that McCraven's gin stands three or four hundred yards below the west line of section 7,

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

which would be in section 6, and more than three miles from section 33, on which Newman resides and has his improvement. Foster's improvement, therefore, was more than three miles distant from the land claimed in the present suit, to wit: section 33, which could not be included in the reservation, if properly located, to include Foster's improvement, or a portion of it. The truth is, that the reservation as located, includes no portion of Foster's improvement. True, it is bounded in part by some sectional lines of survey; but it is scattered and bounded by the sectional lines of no less than eleven different sections. Can this be a fair construction of that part of the grant which says that the said reservation shall be bounded by sectional lines of survey, so as to include the improvement? The object of the grant certainly was to locate it in a body. The 8th article of the Cherokee treaty of 1817, is very similar to the 14th article of the treaty of Dancing Rabbit Creek, except that in relation to the location of the reserve, the clause is, that the reservee shall have 640 acres to include his improvement in the centre as near as practicable. This treaty has undergone many judicial constructions in the courts of Tennessee; but the opinions of the court are so very conflicting, that they can scarcely be considered authority, except on one or two points in which the Judges were unanimous. In the case of Pathkiller, 2 Yerger, 422, 4, and 5, Judge Catron says, that it was a material point that he should have resided on the improvement locating the reserve at the time the treaty was made. Pathkiller, the Indian, had those improvements. In the case of Wies and Wife *v.* Donoho, 3 Yerger, 445, Judges Catron and Green decided, that residence on the land claimed was necessary to give identity and title to the land claimed. In 2 Yerger, 439, the court decided, that the improvement gave locality, without which the grant would be void: and that a voluntary removal from the land was a forfeiture. The same principle was settled in 5 Yerger, 333. And in the case of McIntosh *v.* Cleaveland, 7 Yerger, 60, it was adjudged by the court, that a removal to avoid a prosecution for theft or murder, or to avoid the penalties of the law, would work a forfeiture. The evidence in the case under consideration shows, that Foster voluntarily removed from his pretended reservation, to avoid a prosecution for murder,

before the expiration of five years after the ratification of the treaty, and therefore forfeited his right to a legal title.

The record in this case presents so many unquestionable errors, that the counsel for the plaintiffs in error deem it unnecessary to discuss each separately; and yet some 35 or 40 of the errors assigned, are so glaring that it is difficult to make a selection. The counsel therefore claim for the plaintiffs in error, the benefit of each and every error assigned and contained in the record, while the discussion has been confined to general and leading principles involved in the case. The last one proposed for the consideration of the court, is that in relation to the legal effects of a patent, and the title of the plaintiff in error. It is quite clear, that neither Foster, nor his assignees Harris & Plummer, ever had any title, either legal or equitable to the land in controversy. But if they ever had a title, it was nothing more than an inchoate or equitable title. The plaintiff in error claims the land in controversy as assignee of Pearce Noland, assignee of a Jefferson College float, or location, legally and fully executed and located, 21st October, 1833, which has the force and effect of a patent, and the title under the certificate of the Register, in the language of the act of Congress, (which makes it a patent,) "shall be accounted and held as valid and complete, as if a patent had issued therefor." 2 Volume Land Laws, 307.

In the case of Broadman *et al. v.* Lessees of Reed & Ford, *et al.* 6 Peters, 342; Judge McLean says, that " this court has repeatedly decided, that at law, no facts behind the patent can be investigated; that the grant was a complete appropriation of the land therein described, and vested in the patentee the title; and that any defects in the preliminary steps by which it was acquired, were cured by the grant." And in the case of Bagnell *v.* Broderick, 13 Peters, 450; the court says, that Congress has the sole power to declare the dignity and effect of titles emanating from the United States, and that the whole legislation of the Federal Government, in relation to the public lands, declares the patent to be the superior and conclusive evidence of legal title. Until its issuance, the fee is in the government, which by the patent passes to the grantee, and he is entitled to recover the possession in ejectment. The practice, say the court, of giving in evidence

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

a special entry in aid of a patent, and dating the legal title from the date of the entry, is familiar in some of the states, and especially in Tennessee. Yet the entry can only come in aid of a legal title, and is no evidence of such title standing alone, when opposed to a patent for the same land. Where the title has passed out of the United States by conflicting patents, as it had in the case in 6 Peters, there can be no objection to the practice, to give effect to the better right in any form of remedy, the Legislature or the courts of the state may prescribe. Nor do we doubt, (say the court,) the power of the states to pass laws authorising purchasers of land from the United States, to prosecute actions of ejectment upon certificates of purchase, against trespassers on the lands purchased; but we deny, that the states have any power to declare certificates of purchase of equal dignity with a patent. 13 Peters, 451. Hence it follows, that the plaintiff in error, holding under a patent, and the defendants having no other than an inchoate or equitable title, *if any*, that the patent is the superior evidence of the elder legal title, and must prevail in the action of ejectment. The equities of Foster, if he has any, cannot be enquired into in a court of law, so as to affect the patent of the plaintiff in error.

Prentiss and Clark, on the same side.

Anderson, for defendants in error.

Foster's claim is prior in time, and if clothed with the forms, and attended by the requisites prescribed by the treaty, his right of course is best.

Was it necessary for Foster to have an improvement to become a reservee under this treaty? We contend it was not. By the 14th section, each Choctaw head of a family shall be permitted to become a citizen by signifying his intention to the agent within six months, after the ratification of the treaty; and he or she *shall thereupon* be entitled to a reservation, &c. Here is a positive stipulation, a title accrues upon two conditions only, the claimant must be the head of an Indian family, and must signify his intention of becoming a citizen within six months; *thereupon* or upon these conditions, and these alone, he *shall* be entitled, &c. The expression in the latter clause of the 14th article, "said reserva-

tion shall include the present improvement of the head of the family, or a portion of it," is directory as to the location only; this stipulation does not relate to the right, but merely to the designation or location of the right. The treaty does not say the head of a family who wishes to become a citizen, and who has an improvement, &c. shall be entitled; but he shall be entitled, if the head of a family, *upon* signifying his intention to the agent, of becoming a citizen. According to the well settled principles, this stipulation is to be construed most favorably to the grantee, Foster. It is the grant or concession on the part of the United States; these are their words and agreement in favor of the Indian, and are to be taken most strongly against them; this is a familiar principle to all. This stipulation was in favor of the reservee, it was inserted for his advantage, the particular location of a reservee was a thing for future joint action of the contracting parties; the United States appointed her agent to put down the location on the general plat, and to record it, &c. in doing which the reservee was restricted, in fixing his boundaries, to sectional lines of survey, and was not permitted to cull choice spots by departing from the lines of survey. The United States had the right to control him in this; on the other hand, he had a right to demand and require of the United States, that his reservation should be located to include his home, if he had one.

This point was decided by the supreme court of Tennessee, under the treaties of 1817 and 1819, with the Cherokees, which contains a similar provision to the Choctaw treaty. See the opinion of Judge White in the case of Blair & Johnson *v.* The Pathkiller, in 2d Yerger's Rep. 429, and the very excellent opinion of Judge Peck, in the same case, is to be found in 5th Yerger's Rep. 327. To these opinions I refer, and especially to the latter, for a more satisfactory demonstration of this point than I am capable of.

It cannot be reasonably assumed that it was the intention on the part of the United States, to discriminate between Indian families who had improvements, and those who had none. The privilege was to all who were heads of families, to become citizens. What reason could be assigned for excluding the family who had no improvements?

This direction or provision of the treaty can be observed when

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

the Indian has an improvement, but when he has none, all that can be said of it is, that it is a case where the treaty has given a right to a reservation, but has prescribed or fixed no rule as to the location thereof: and that in its location, (a thing to be effected in all cases, by the mutual action of the parties) no restriction is prescribed to either party, but that the reservation shall be bounded by sectional lines. This construction of the treaty will comport with the known policy of the general government, in its dealings with these people, and will make the treaty itself a consistent instrument. But if this construction is rejected, and it is held that no Indian is entitled to a reservation but such as have improvements, is not the positive declaration of the treaty, in that part of it which purports to declare who shall have right, that the head of a family, upon signifying his intention to the agent, &c. shall be entitled, a specious falsehood, calculated to deceive and mislead these unlettered people, with whom we were treating, and to whom we were professing a fatherly and protecting kindness? According to this positive declaration of the 14th article, every family in the nation might have taken a reservation, but, according to the construction, we combat all who hunted and lived in camps, all who lived with others, all who lived in villages, who could not have a reservation; these, embracing perhaps one half the nation, will be excluded. Can it be seriously contended, or can it in seriousness be believed that either the United States or the Chiefs of the nation intended this discrimination? and if this be the construction, cannot the people of the Choctaw nation justly complain that their kind Father has cheated and deluded them into a trap, laid in the dubious meaning of the bargain, as put into our own language not so well understood by them? Every functionary of this government, as well as every citizen, should feel a proud superiority to such higgling. We should feel as we professed to feel in making this treaty, and especially, when in the conclusion of the 18th article, we agreed that when a well founded doubt should arise in the construction of this treaty, it should be construed most favorably to the Choctaw.

Whatever has been the construction which the government has put on the treaty in relation to this point, should be considered by the court as the proper one, and to be the law of the case. It is

a question between the Indian and the government, and no one can gainsay her action on the question. The construction here given by the court below has been the construction upon which the government has acted in other cases as well as this. See the 2d vol. of Pub. Land, &c. p. 188, No. 125, Hawkins's case. Also 205, No. 139, Wall's case, who had no improvement.

Throughout this treaty, the purpose and promise of the government is seen, that the Indian claim is to be satisfied before they can be interfered with.

By the 3d article, they are given to the last of the fall of 1833 to remove.

By the 18th article, no person is to be permitted to settle on the land to be sold until the Indians are removed.

By the 14th article, the reservation is to be bounded by sectional lines of survey. And although by the 18th article the United States stipulate for the privilege of surveying as soon as they may see proper, yet they do not bind themselves to the Indians to make the surveys even within the five years, or to furnish a locating agent or any other means of fixing the boundaries of reservations. How then is the Indian to make good his claim until the surveys are made, and until the government provides for its location? If he cannot do it as the court below declared by a public claim to the land around his residence or improvement, he cannot do it all, and his claim would be no more than the subject of derision to the keen white speculator.

I again refer to the practice of the government to sustain those views on this part of the case. 2d vol. Land Laws and Opinions, &c. 208, No. 142, Pusk-tshen-nubbee's case. All claims under the treaty are to be satisfied, &c.; possession is notice to all the world of the Indian's right, &c. Same Book, 483, 484, No. 412, and 413. The registers are directed to suspend the sales, because all the reservations were not located. See also 488, No. 419.

It is objected that this reservation does not all lie contiguous. The treaty does not require, in terms, that it should lie contiguous, and the treaty is to be construed in favor of the Indian, in all doubtful questions under it.

But suppose the construction of the treaty requires the reservation to lie contiguous. There is no other restriction on the reser-

vee as to the form or shape of his reserve, than that he has to follow the lines of survey. He may start out from his improvement, laying his reservation to the north, south, east, or west in a square, in an oblong, in a triangle, or in any shape that can be formed out of a connected set of subdivisions of the land by the public survey, placing his improvement in the centre, in the north-east, north-west, south-east, or south-west corner at his pleasure. If Foster had embraced lot No. 3, of fractional section No. 31, in his location, then his whole reservation would have been contiguous. He might have left out lot No. 1 or 5, in fractional section No. 33, and had the proper quantity. In other words, Foster had a right to locate all the lands he has located, except lot No. 1 or 5, in fraction section No. 33, and lot No. 3, also in fractional section No. 31; but he loses this lot, No. 3, by a superior reserve, that is, a reserve located upon it before his is located; and now, it is contended that because this lot, No. 3, intercepts between his improvement and the other portion of land which he had a right to embrace, together with lot No. 3, of section No. 21, in the location of his survey, that forsooth, he must lose all. Would this not be, in the language of Judge White in the case of Blair & Johnson *v.* The Path-killer, " higgling on terms, and stickling upon trifles, rather beneath the gravity of a judicial proceeding, and wholly incompatible with a just and favorable construction of this treaty, in support of the Indian's right." If the location should have been contiguous, it will be right to allow Foster to hold as much of his reservation, as he could have laid contiguously and held, which is easily susceptible of ascertainment.

But again, however this question might be, it is a question of formality, one that concerned the government alone; the government is satisfied and has directed this location. Who else has a right to complain?

The location of the land by the government, through her officers, according to the claim of Foster and the treaty, gives Foster a legal title to possession, 2 Yerger's Rep. 407, Blair & Johnson *v.* The Path-killer. The treaty being the law of the land, is a statutory title. A patent although provided for by this treaty, in fact makes the title no better. The reservee had a title for the whole five years possession which was to elapse before the patent was

46*

to issue. The various cases in the Tennessee Reports, which will be referred to, are the treaties of 1817 and 1819 with the Cherokees, is proof of this position.

The validity of a title emanating from the government, cannot be questioned, or tried in a collateral way. The government may impeach the title by *scire facias,* and may set it aside by the judgment of the court, &c., but it cannot be called in question in any other manner, nor by any other party. While the government rests satisfied, all other persons or parties must do so likewise. 2 Tennessee Reports, 37, 154.

Whatever preliminary steps may have been necessary to complete Foster's right to a reservation, was to be judged of by the government; I would rather say it was the right of government to require the performance of, and when she is satisfied her grantee is estopped to complain or object. The registration of Foster's name with the agent, and the location of his claim on the land in dispute, is conclusive evidence of his possessing all the requisite claim for a reservation. See 5 Yerger's Rep. 323, Jones *v.* Evins.

Foster, after registering his name with the agent, may be compared to one, who, under the laws of North Carolina, had entered and paid for a tract of land, whose entry was special: for instance, an entry which called for such an improvement or a camp as in 2 Ten. Rep. above cited at page 321. We may carry on the parallel—the special enterer had a right to survey his land in a square or oblong to the cardinal points; he might place the special object called for in any corner of his survey; thus he had for his 640 acre entry, a selection of nearly four times that quantity on which to survey his entry, and any person who wished to enter the adjoining land between the date of the first special entry, and the survey thereof, was bound at his peril to obtain information *in pais* of the particular manner in which the survey should be made. The entry was notice to him, that the improvement or camp was appropriated, but it was no notice in fact, whether that entry would be surveyed to the north, east, south, or west, in an oblong or square; yet he was bound by the whim or caprice of the owner or surveyor, when he come to survey, if he chose to run the first entry in an oblong to the north-east, from the object called

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

for, he would hold that land notwithstanding it might be entered and granted subsequently to his entry, and notwithstanding he might have surveyed it to the north-west, to the south-west, or to the south-east, and taken vacant land and avoided the land thus granted to the north-east of his specialty.    2 Tennessee Rep. 18, 19.    Barnet's Lessee *v.* Russell and others.    Same book, page 212, Kendrick *v.* Dellum, and many other cases in Tenn. Rep. which can be seen by reference to the subject, in the indexes, but which need not be quoted.    In analogy to this doctrine, we insist that it was the duty of the government's officer to locate (which was equivalent to a survey under the land laws of North Caro_lina, because the location had to be by an existing survey, &c.) we say it was the duty of the government officer to locate this reservation before any other entry, or sale, or disposition of the land was made.    The United States had stipulated that they would not sell or dispose of the land, until the Choctaws should remove ; article 18, and article 3 of the treaty, gave the Indians the whole of the falls of 1831, 2, and 3 to remove.    Foster's ap_plication to the government's agent to locate, was before this time, and before the sales, and before any one had any right to appro_priate the land in any way, except for reservations.    The reser_vee done all in his power to complete his title.    He cannot be defeated by the default of the government upon any principle. Nor can the donee of the government claim any advantage of any want of form to his title, which was owing to the default of the government's officer.

Whoever claims by a younger title from the government than Foster's, was notified by the treaty, and by the registry of Fos_ter's name, and by his improvement and actual occupancy, that he claimed the land at that place.    They in this case were fur_ther bound to know of his application to the agent to locate this very land, although this was an act *in pais*, because the govern_ment knew it.    And the college's assignee is a purchaser under the government.    The government was bound by this applica_tion, and so must be her subsequent vendor.

It will be contended against this reservation, that Foster had no right to a reservation, on account of his accepting the provisions of an act of the legislature of Mississippi, found in the Revised

Code, page 577, granting him the privileges of a citizen, upon the condition of his agreeing to discharge himself of his Indian privileges. This question came before the court of Tennessee, in the case of Morgan *v.* Fowler, 2d Yerger, 450. Morgan was a white man, enjoying all the privileges of a citizen of Tennessee, married an Indian wife, continued to exercise his privileges of a citizen of Tennessee. He was one of the delegates of the Cherokee nation to make the treaty of 1819. The case of Foster is a parallel one, except that Morgan enjoyed by birth what was conferred on Foster by act of assembly. The court declared that all parties were estopped to question his character and privileges under the treaty as the head of an Indian family. The United States were estopped, because they had treated with him as an Indian, and the nation were estopped, because they had delegated him, and united with him in the formation of the treaty. Other cases occurred in Tennessee, which it is not necessary to quote, as this case is so directly in point, and the reasoning of the court, it is presumed, will be so satisfactory, that it is not thought necessary to add any thing more on this point. Upon this view it was right to reject the evidence offered.

The treaty with the Choctaws at Dancing Rabbit Creek, was approved by resolution of the Senate, on the 21st February, 1831, and by the President on the 24th of the same month.

The Constitution of the United States confers on the President, the power, by and with the advice and consent of the Senate, to make treaties, &c. Article 2d. sec. 2d. clause 2d.

This negociation was commenced on the 15th September, 1830, and concluded on the 27th September, 1830, between the commissioners and chiefs. Yet it was no treaty on the 27th September; it must have the sanction of the President; that sanction must be by and with the advice and consent of the Senate; that advice and consent was given on the 21st February, and that sanction of the President on the 24th of February, 1831. Thus this treaty was in progress of being made and concluded from the 15th September, 1830, until the 24th February, 1831. Can it be said this was a treaty, until the 24th February, 1331? no one will so pretend. This treaty, then, which springs into life on the 24th February 1831, and for the first time has being or existence on that day,

uses these words in relation to a reservation, viz: "said reservation shall include the present improvement of the head of an Indian family, or a part of it." And the question is, what time is meant by the word present? Present means the same moment of time that the expression is used, but when are we to consider the expression as used or uttered? Considering it as a part of an agreement, can it be considered as uttered anterior to the conclusion of the agreement, anterior to the agreement having the assent of both parties, anterior to its existence as an agreement. Until the President, with the advice and consent of the Senate, consented to, accepted and ratified this contract, it was but a proposition on the part of the Indians, or a contract assented to by one party, and proposed to the other. It had no obligation, no force, no binding influence on either party.

Now while the treaty was progressing, while the commissioners were holding their talk with the chiefs, from the 15th to the 27th September, 1830, we may suppose this expression was frequently uttered by both parties, it may have been uttered on the 15th, 16th, 20th, or 26th, or any day, and every day, from the 15th to the 27th, but the position would not be assumed by any one, that the first time the expression was used among them, fixes the period at which improvements would be included, and that all made afterwards would be excluded; and why? because the expression was not yet used operatively, bindingly; it was only a proposition, so it cannot be urged with any more good sense, that the last time it was used between the commissioners and the chiefs, and even when written down and signed by them, fixed the time at which improvements were included, and subsequent improvements excluded, for the very same reason it was not then yet used operatively and bindingly. It was not then yet the treaty. It had yet to get the assent of one of the contracting parties. Though the commissioners were the agents of the United States, it is one of the special cases in which the principal is not bound by the act of the agent until ratified.

Suppose it should turn out upon investigation that the 14th article of the treaty was in fact agreed upon on the 18th day of September, 1830, between the commissioners and chiefs, and was

written down on that day just as it is, and that some Indian had married him a wife on the 19th, and had cut the logs for his cabin on the 23d, and built it on the 24th, and moved his wife and dog, and gun, and blanket, and venison ham, and deer skin, into the cabin, and lived there on the 25th of September, 1830, and from thenceforward would any one be bold enough to argue that he would not be entitled to his reservation? None would. But why would not the position just be as sound and plausible as the one taken against Foster. Those whose interest might be opposed to such reservation, could with truth say said Indian had no improvement when the chiefs and the commissioners agreed upon the 14th article, and they using the words *present* improvement, meant (they might contend,) an improvement existing on the 18th of September, when said article was agreed upon. Now should such a case arise, no one who respects his own character would expose himself to the ridicule which he would incur, by urging such a position. And how could the case be distinguished from the present one, we would ask, in principle? I can imagine nothing which could be urged, as distinguishing the case from Foster's, except this: It might be said that although the chiefs and commissioners, in fact agreed upon the article on the 18th of September, and wrote it down, yet it was not binding until signed, and as it was not signed until the 27th, the article must be considered as speaking on, and from that day. Now this would be a sensible and sufficiently distinguishing feature from Foster's case, if the signing of the treaty by the chiefs and commissioners was the conclusion thereof. If this act, to wit, signing, made it a treaty, and gave it binding force, then the argument would amount to exactly what we urge, to wit: that we listen to the treaty as speaking at, and from, the moment of its conclusion, and binding existence, and from no other.

Certainly this is the sensible construction of the treaty, but if not indisputably so, yet so plausibly so, and so doubtful whether it be not the true construction, it ought to be adopted as most favorable to the Indian, according to the 18th article.

The 13th charge for the plaintiff below, is nothing more than the simple proposition that the government is bound and estopped

by its own acts and acknowledgments, done and made through her officers and agents, like individuals, which I presume needs no argument to support it.

We insist that the certificate to P. Noland is utterly void, being issued without the authority of law when issued and in violation of the treaty. The government by the third and eighteenth articles in connection, were bound to make no sales before the 1st December, 1833. Congress could pass no act by which any of the land was to be acquired and appropriated by individuals, before that time, without violating this stipulation, which would make such act *void*. The constitution and treaties are the supreme law of the land. 1st article 3d section of the Constitution of the United States.

In support of this position we refer to 8 Wheaton, 464, The Society for propagating the Gospel, &c. *v.* New Haven. It was held that, the land held by this society, which was incorporated before the American revolution, was protected in its right to hold the same, by the treaty of 1783, and that a law of Vermont, appropriating it to other uses after the revolution, was *void*.

In 1 Paine's Rep. 55, Doe *ex dem.* Fisher *v.* Hernden, it was held that a treaty operated a repeal of a pre-existing state law inconsistent with the treaty, and that a judgment of forfeiture founded on the state law, given after the treaty, was wholly void.

In 1 Wash. C. C. Rep. 322, Gordon *v.* Kerr, it is held that a treaty is paramount to the constitution of a state. There can be no difference between the state and national legislation, as to this point.

But notwithstanding the register construed the law of 1832, under which P. Noland entered the land as assignee of the Jefferson College, in violation of this treaty, we insist the construction is erroneous. This statute is seen in the 8th vol. Statutes or acts of Congress at large, page 541. The act of 1832, chap. 659, the second section, in granting the privilege of entering or selecting the *unappropriated* land, &c., uses the words "to be selected, entered, or located, either before or after the same may have been offered at public sale, &c." Now this expression was taken by the register to mean that it might be selected, entered, or located, either before or after the same might be offered at public sale—in

this, lay his error.   The treaty presented a prohibition to dispose of any of the land, until the 1st December, 1833; the words used in the act of Congress are perfectly consistent with that prohibition.   It was not necessary for Congress to repeat the limitation to the right to acquire the land from the United States, or of the United States to dispose of it.   That limitation stood the paramount law of the land, by a power superior to Congress,—by the constitution; and they grant a disposition of the land after that limitation of time either before or after this land may have been exposed to sale, the treaty and the act can by this construction be made to harmonize.   It is a settled rule of construction, that if the act can bear a rational construction consistent with the constitution, the court will give it that one, and not a construction which places the legislature in opposition to the constitution, in defiance of its oath and duty.

If we have sustained the first point argued, to wit, that the Indian head of a family was entitled to a reservation without an improvement, then there was nothing to supercede his right to a selection of any lands, except other reserves, until after the College claim was located; and if that location and certificate given by the register was *void*, as we have contended, then indeed there was no obstacle in the way of Foster's location when it was made in 1834.   We urge this view of the case without yielding Foster's right to locate at any time within the five years.   If he lived on the land, as he did, and continually claimed to enclose or to hold it as his reserve, his right to enter whenever the government officers attended to his demand, could not be impaired by any subsequent claim or purchase, if he had not succeeded for twenty years to obtain his location.

The admission of the copies objected to was allowable, if not by the rules of the common law, yet by the act of the legislature of 1837, p. 345, pamphlet acts; Laws of Mississippi, p. 760.

By the act of Congress of 1789, establishing the office of Secretary of War, he is given the custody of the books and papers, &c. Gordon's Digest, 70, 71.

By the act of 1832, 8 vol. Laws, &c. 654, the office of Commissioner of Indian Affairs, under the Secretary of War, *is created*, and is to manage all the affairs relating to the Indians.

[Newman *v.* Doe *ex dem.* Harris *&* Plummer.]

The certificates, as they were presented under these acts of Congress, and acts of the legislature, were legal evidence.

But the second bill of exceptions was not taken in time, that is before the jury retired, nor indeed before they returned their verdict, so far as we can tell from the record. It is the settled rule of this court, that they cannot notice such exception. 3 Howard's Rep. 117, Green *v.* Robertson.

The papers read and excepted to in this second bill, contain all the facts necessary to show that Foster was entitled to his reservation; that the government was satisfied of these facts, and allowed it to him. And with this all the world must be content.

If there was any doubt as to the law, on the sixth and seventh charges asked by plaintiff in error, there was nothing in the evidence requiring a charge on the point.

The eighth charge asked, was contrary to the principles already established to be correct.

I cannot see plausibility in the twelfth instruction asked, nor the fourteenth.

Fifteenth and seventeenth are against the plain meaning of the treaty.

Nineteenth, is a request to the judge to state a suppositious fact, which supposition itself is a legal falsehood, or error, according to what he had before stated, and what we think we have proved he was correct in.

Twentieth instruction contains nothing worth serious notice, as we suppose.

Twenty-first instruction was asked upon a point to which there was not a word of evidence.

Twenty-fourth instruction is plainly erroneous. It might be that he located different from what he had spoke of claiming, and that difference might have done the defendant no injury, nor is there any thing in the evidence to lead to the suspicion that such was the fact. Certainly, then, the proposition that the defendant's title became the best for the whole of the land, was as wide of the law as the plaintiff in error could well get.

If the whole proposition asked of a judge to charge is not correct, he is bound to give no part of it. 3 Howard, 125, Doe *ex dem.* Martin *v.* King's heirs.

Foster's leaving the country, to avoid a prosecution, had no effect upon his right of possession. It was proved without exception that Foster had gone off before the five years expired, nor was the fact disputed, or the evidence questioned; but the defendant below was not content without showing, or offering to show, that the cause of his absence was the commission of some crime. Surely it would have been disgraceful to the court to have permitted such an investigation.

2 vol. Laws and Opinions, 434, No. 369, Coleman's case.—If a reservation be on a fractional section, it must be extended to an adjoining one, to make up the quantity. Different with floating claim.

Mr. Chief Justice SHARKEY delivered the opinion of the court.

The defendants in error brought ejectment for the land mentioned in the declaration, and claim title thereto as the grantees of Hugh Foster, who claimed by virtue of the 14th article of the treaty concluded at Dancing Rabbit Creek, in 1830, as the head of a Choctaw family. The defendants in error succeeded in the court below, and the case is brought up by writ of error. The grounds relied on for reversing the judgment, are contained in nine bills of exceptions taken at the trial, each of which is made the foundation for a general assignment of error. Some of them also embrace many points, which will of course be considered, or such of them as may be material in their appropriate places.

1st. It is first assigned as error, that "the court permitted the lessors of the plaintiffs to read in evidence to the jury the transcript of the registry of Choctaw names, kept by Ward, United States Agent, of the applications of Choctaws to become citizens, without showing that the names were the names of Choctaw heads of families." To understand the force and application of this instrument, as a matter of evidence, resort must be had to the treaty, and as we shall have frequent occasion to refer to the 14th article, it is inserted as follows, to wit: "Each Choctaw head of a family being desirous to remain and become a citizen of the States, shall be permitted to do so, by signifying his intention to the agent, within six months from the ratification of this treaty, and he or she shall thereupon be entitled to a reservation of one

section of six hundred and forty acres of land, to be bounded by sectional lines of survey; in like manner shall he entitled to half that quantity for each unmarried child which is living with him, over ten years of age; and a quarter section to such child as may be under ten years of age, to adjoin the location of the parent. If they reside upon said lands, intending to become citizens of the States for five years after the ratification of this treaty, in that case a grant in fee simple shall issue; said reservation shall include the present improvement of the head of the family, or a portion of it. Persons who claim under this article, shall not lose the privileges of a Choctaw citizen; but if they ever remove are not to be entitled to any portion of the Choctaw annuity." The privilege of becoming a citizen was conferred on each head of a family, provided he signified his intention to the agent within six months after the ratification of the treaty. It became, therefore, the duty of the applicant to signify his intention. It became the corresponding duty of the agent to receive that signification and to register his name. No particular form of doing this was pointed out, but the one adopted was as convenient and effectual as any other, and the registry so taken was an official act, and proper evidence under the general rule that certificates and other documents made by persons entrusted with authority for the purpose, are evidence of the facts which they are required to certify to, to the extent of their authority. 1 Starkie, part 2, 173. The treaty having appointed the agent for this purpose, he must be trusted as far as he acts under the authority conferred. He was not authorized to register any other persons but Choctaw heads of families, and it is to be presumed that he did his duty. The document professes to be a "Register of Choctaw names as entered by the agent previous to the 24th of August, 1831, who wish to become citizens, according to the provisions of the late treaty in 1830." Now either the agent violated his duty, or these persons were entitled to the benefits of that treaty; as we are not at liberty to suppose a violation of duty, we must regard the register as evidence that they were Choctaw heads of families. Under a similar provision in the Cherokee treaties of 1817 and 1819, the registry of the name with the agent, was held to be conclusive evidence that the individual was the head of a

family.   5 Yerger, 323.   The first error is therefore not well founded.

2d.  It is secondly said, " that the court erred in permitting the lessors of the plaintiff to read in evidence to the jury the copies of private letters from Hugh Foster, Elbert Herring, F. E. Plummer *et al.* set out in the second bill of exceptions."   This bill of exceptions contains several communications, but it does not appear that any of them were permitted to be read to the jury, except two.   The first is Foster's application to have his land located, in which he specified the particular sections and lots claimed, addressed to G. W. Martin as locating agent, and the second is Martin's certificate that Foster was registered for the land claimed, in which the register at Chocchuma is requested to reserve it from sale.   To these documents there can be no objection.   Under the treaty it became necessary to have his land located, and for that purpose the locating agent was appointed.   The reservation would have been otherwise incomplete for want of identity. By this application Foster was presenting himself as a claimant under the 14th article of the treaty, and taking the necessary steps to avail himself of the provision.   By the treaty it was necessary that Foster should designate the land which he claimed, so that the government might fufil its stipulation.   By the treaty the right was given, but identity was wanting, and the application to the locating agent fixed this also.   As evidence of identity, these documents were admissible.   The certificate of the locating agent was an official act within the scope of his duty, and as such must be entitled to credit.   But it is said that they were mere copies. This objection might prevail, if the originals were subject to the control of the party, but if they were necessarily placed in the department of Indian affairs, as documents pertaining to that office, then of course the originals being beyond the control of the party, copies certified by the proper officer were admissible.   Counsel have been silent on this question, and we are left to infer from the fact of their being certified by the superintendant of Indian affairs, whose certificate is approved by the Secretary of War, that their custody was according to law.   But it is further to be remarked, that these documents prove nothing but location, a fact which was in fact proved by parol.   They are not title papers,

but relate merely to the identity of land, the title to which passed under the treaty.

3d. The third error assigned is, "that the court allowed to go to the jury, on the part of the plaintiffs, the evidence of G. B. Wild, to prove that G. W. Martin was the acting locating agent of the United States government, to locate the reservations of the Choctaws. In reference to all peace officers, justices of the peace, constables, revenue officers and military officers, it seems to be sufficient to prove that they acted in their several capacities, and were reputed to be such officers, without producing their appointments. Phillips's Evidence, 171. No good reason can be perceived why this rule should not extend to the locating agent.— The witness testified that Martin was reported to be the locating agent, and acted as such from 1833 to 1837, and this was at least *prima facie* evidence of his appointment for all purposes connected with this controversy.

4th. The fourth ground of error is, "that the court erred in ruling out and refusing to permit defendant's counsel to read in evidence to the jury the act of the Legislature of the state of Mississippi granting to Hugh Foster certain privileges, upon his relinquishing all his Indian privileges, as set out in the fourth bill of exceptions."

5th. In connection with this objection and as a constituent part of it, may be considered the fifth error, to wit: that the court erred in refusing to permit defendant's counsel to read to the jury a certified copy of the record of relinquishment, by Hugh Foster, *et al.* of all his Indian privileges, filed in the county court of Claiborne county in 1826, which is set out in the bill of exceptions. The questions here propounded may be briefly answered thus: If Foster had Indian privileges and relinquished them under this act, it was a contract, if a contract at all, beetween him and the state of Mississippi, and although the general government might with some plausibility have urged it as a reason why he should not be entitled to a reservation, yet if it has not done so, it does not lie with defendants to make the objection. If the lessors of the plaintiff recover, it must be on the strength of a title already acquired, and no objection can be heard which should have been urged against the inception of title. We can only enquire wheth-

47*

er he has a title under the treaty, not whether he ought to have had one. If he was treated by the general government as the head of an Indian family, it is sufficient, and that he was considered as an Indian is shown by his signature to the treaty.

. 6th. It is next said "that the court erred in ruling out the testimony of Orrin Kingsly, and in refusing to permit the defendants to prove by said witness, that Hugh Foster had voluntarily removed from his residence and improvement before the expiration of five years after the ratification of the treaty of Dancing Rabbit Creek, to avoid a prosecution for felony, and that he did not reside upon said land for five years after the ratification of said treaty." In the consideration of this proposition, we are necessarily led into an inquiry into the nature of Foster's title, and whether he held, subject to the condition of five years residence. For the plaintiff in error, it is insisted that his title was only equitable, and therefore insufficient to maintain ejectment. In support of this position that clause of the treaty is relied on which provides that "if they (the reservees) reside on said lands, intending to become citizens of the states, for five years after the ratification of this treaty, in that case, a grant in fee simple shall issue," and hence it is said that by providing that a grant should subsequently issue, the title acquired by the treaty must be inferior to a grant amounting, in reality, to nothing but a promise to grant on certain conditions. It is further insisted, that as the Indians had nothing but a right of occupancy, a grant was necessary to pass title. Since the decisions in the cases of Fletcher *v.* Peck, and Johnson *v.* McIntosh, the Indian title is understood to mean but a right of occupancy. That, it is conceded, they have, and with all deference to the decisions mentioned, this concession seems to me to produce some departure from principle. A perpetual and exclusive right of occupancy, is not easily distinguished from a right of soil. A fee is but an inheritable right to occupy or hold, to the exclusion of all others. Denying them the power to alienate to any other power than to the United States, is only an abridgement of an incident to the right of property, for the power to alienate is but an incident to a fee simple, and not an essential requisite. Perhaps the opinion of Judge Haywood in the case of Cornet *v.* Winton, is more consistent with the laws of nations in

relation to the right acquired by discovery and conquest. He holds the Indians to be mere tenants at sufferance, having neither a right of property or possession, and removable at pleasure. The nature or extent of the Indian title is not material, however, in the present controversy. If the title to the soil was in the Indians, the terms used in the treaty are undoubtedly sufficient to prevent their right from passing to the United States for such portions as were excepted out of the general cession, and to each head of a family was reserved a certain quantity, on his performing certain acts. The reservation secured a right to a portion of that which was before held in common. If on the other hand the right to the soil was in the United States, the right to dispose of particular portions of it to individuals by treaty, cannot be questioned. Assuming the latter position as the true one, the right has been well conveyed by the treaty.

By the common law there were several kinds of assurances, each having its technical peculiarities, and they were all equally effectual, but it is not necesssary that any of these should be resorted to by a government exercising its legitimate functions, and hence we find that it has not been uncommon for the states to grant by legislative act, and for the United States to grant by act of Congress. By treaty is a mode equally valid. The only question therefore is whether a grant has been actually made, or that which is equivalent to a grant. In construing Legislative acts, we look to the intention of the Legislature; in construing treaties the same rule must prevail, in order that they may be carried out in good faith. Independent of the condition of the people with whom this treaty was made; their want of skill in making contracts; their implicit reliance on the government for protection, and a just policy; the liberality which has been professed towards them; the declared parental affection entertained for them; independent of all these considerations, there is an additional reason for giving a liberal construction to this treaty. We find in it a clause expressly providing that whenever a well founded doubt shall exist, it shall be construed most favorably for the Choctaws. When, therefore, the treaty declares that each head of a family who wishes to become a citizen shall be permitted to do so by signifying his intention within six months, "and he shall

thereupon be entitled to a reservation of one section of six hundred and forty acres of land," what did it mean?   Can it be said there was no intention to give a title to this land? it certainly cannot. The object of the concession was to provide a permanent home for the individual.   It would be tantalizing and deceptive to say to him afterwards that no title was intended to pass.   We cannot doubt but what the commissioners intended that the right of soil should pass on conforming to the conditions, and still less can we doubt but what the Indians, by the term "reservation," used in this article, supposed they were providing for a good title.   Suppose one claiming under this provision should actually have resided on the land five years, after complying with the other conditions, could it be said that his title was incomplete? and still it would be so if a grant be necessary.   The subsequent provision that a grant in fee simple shall issue, does not destroy the legal effect of the previous part of the section, as will be shown hereafter.   In the 19th article we find the following language, to wit: "the following reservations of land are hereby admitted; to Col. David Fulsom four sections, of which two shall include his present improvement, &c."   It is evident that a title was intended to be conveyed by this language.   It was designed to convey the right, and is sufficient to do so.   In the 2d article of the supplement is the following language, to wit: "and to each of the following persons there is allowed a reservation of a section and a half of land, &c." and so in other articles of the treaty, from which it is manifest that the term "reservation," has been invariably employed to convey title.   Without some cogent reason we do not feel authorized to give to it a different meaning in the 14th article, from that which it is entitled to and must receive in other articles.   The use of the same language or words, in the same instrument, must be regarded as indicative of the same idea.   Indeed so common is the word "reservation," in the various Indian treaties, that it may with propriety be considered strictly technical.   Its meaning is generally understood, but particularly by the Indians.   In the case of Eu-che-lah v. Welsh, 3 Hawkes R. 155; the words "do agree to allow a reservation of six hundred and forty acres of land to each head of a family formerly residing within the ceded territory," in the Cherokee treaty, were held sufficient to convey the title, al-

though it was objected that they only amounted to a promise to convey in future. The point was so ruled also in McConnel *v.* Mansepaine, 2 Yerger, 438. Under these considerations we must consider that a title passed under the treaty, and this view of the case is not inconsistent with the subsequent provisions. In the further investigation of this branch of the subject, it becomes necessary to determine whether the title was conditional or absolute.

No particular words are necessary to create a condition in a deed, and perhaps still less strictness should be required in a treaty. In both if it appear to have been the clear intention of the parties to make a condition, it will be sufficient. The whole treaty before us was rather inartificially drawn, but still it is believed that we cannot be mistaken in saying that an intention is manifested in the fourteenth article to annex a condition to the grant or reservation. We are told that "the reason of the law, or the treaty, that is, the motive which led to the making of it, and the view there proposed is one of the most certain means of establishing the true sense." Vattel, 320. I have already said, and I think correctly, that the words "shall be entitled to a reservation" used in the fourteenth section, were equivalent to a grant. What was the purpose or motive for making this grant? The language immediately preceding explains it. "Each Choctaw head of a family being desirous to *remain* and *become a citizen* of the States, shall be permitted to do so by signifying his intention to the agent." Permitted to do what; to become a citizen, of course. It was in consideration therefore of his remaining and becoming a citizen, that the reservation was given. It was not given merely in consideration of having signified an intention to become a citizen. It is impossible to conceive how a mere unexecuted purpose of mind could have been considered as an inducement or motive for the reservation. Signifying the intention to the agent was nothing more than a declaration that the party wished to avail himself of the benefit of this article. It was evidently foreseen that some of the Indians would wish to remain east of the Mississippi. Having sold all their land, they would have been homeless without some special provision in their favor, and their habits are too well known to suppose they would have acquired homes by

their industry, or with means on hand.   For such this provision was intended.   The object was to confer on them the privileges of citizenship, and to provide for them the means of living in comfort in the society of the white man.   But some evidences of a permanent residence was also intended to be required, and inasmuch as it might be doubtful what length of residence was necessary to enable them to claim as citizens, the doubt is removed by the treaty.   It is declared that " if they reside upon said lands, intending to become citizens of the States, for five years after the ratification of this treaty, in that case a grant in *fee simple* shall issue."   If this does not create a condition, it means nothing, because no grant in *fee simple* was necessary to confer title, and if the title was not to be forfeited by removing before the expiration of five years, why insert this clause?   It must have been designed for some purpose; that purpose was to annex a condition; it could have been nothing else.   A different interpretation would fix on the framers the charge of absurdity, and treaties are not to be so construed.   Vattel, b. 2, chap. 17.   We are not to suppose the language was used without meaning, and it can have none and must be useless and void, unless it creates a condition.   But by supposing it to mean a condition, it is in consonance with the previous part of the article, and the whole is in harmony with a steady train of thought.   It was saying to the Indian, if you remain and become a citizen, you shall not be deprived of a home; but you must remain five years; this length of residence shall make you a citizen, and your title complete; and then you may dispose of your land if you think proper.   This was but imposing a reasonable condition.   The grant that was to issue at the expiration of that time, was to be an acquittance from the condition, or an acknowledgement that it had been performed, and that the title had become absolute.   Suppose that some length of residence had not been fixed, then a title was acquired merely by remaining long enough to become a citizen.   What time was necessary for this purpose?   Six months would be long enough, and it is not to be supposed that a residence of this short time could have been the inducement for the reservation.   It must be remembered that by another provision in the treaty, they had one, two and three years to remove from the ceded land.   This was certainly a length

of time which might well justify a claim of citizenship, and without some definite provision they might all have claimed to be citizens, and having signified their intention, every head of a family might have removed with the tribe at the time stipulated, without impairing his right to a reservation.

Again, the last clause in the article provides that "persons who claim under this article shall not lose the privilege of a Choctaw citizen, but if they *ever remove* are not to be entitled to any portion of the Choctaw annuity." Why speak of their removal, and the consequences, if it was not intended they should remain five years? On any other supposition than that they were bound to stay, this would again seem to be language used without meaning. The meaning, however, is perfectly plain. The provision had in contemplation and applies to a removal after five years, when they would have a right to do so without further penalty than the loss of the annuity. If this view be correct, it follows that the reservations were made on condition subsequent, the non performance of which put an end to the right, and the court erred in not receiving the proof of Foster's abandonment before the expiration of five years. That a removal to cause a forfeiture must be voluntary, there can be no doubt, and a removal to avoid a prosecution is voluntary. 5 Yerger, 326 ; 7 Yerger, 60. But suppose the reservation was made on a condition precedent, and that no title vested until a residence of five years, as contended by counsel for the plaintiff in error, still the effect would be precisely the same on the title of the lessors of the plaintiff below. In either view, he can have no title without the five years' residence on the land.

7th. This brings us to the seventh point, to wit, "that the court erred in giving the charges to the jury first set out in the seventh bill of exceptions, and in giving the fourteen succeeding charges, as numbered from one to fourteen, inclusive. Many of the charges here referred to fall within the remarks already made; it would be both tedious and useless to notice them in detail; such only as seem to be erroneous or doubtful will be considered. The court charged the jury, that by signifying his intention to remain and become a citizen within a proper time, Foster became

entitled to a reservation of 640 acres of land; and if they believe he had four children at the ratification of the treaty, he was entitled to a further reservation of 640 acres. If by this charge the court intended to convey the idea that the title to the whole 1280 acres vested in Foster individually, and no portion of it to his children, or to him in trust for them, the propriety of the charge may be doubtful. This question has not been discussed, and we shall not now decide it.

The 13th charge given is in these words: "That the endorsement of the agent, G. W. Martin, on the part of the government, is conclusive evidence that the reservation of Hugh Foster, as specified in his application, was in pursuance of and according to the terms of the treaty, and that it sufficiently specified said land as the land to which said Foster was entitled, under the 14th article of the treaty, and that said Foster was entitled to all the land specified in said application." This charge would seem to be too broad. Martin's certificate was evidence of identity, but not that Foster's reservation was "in pursuance of and according to the terms of the treaty," unless the powers and duties of the agent were more extended than we suppose they were; we have been furnished with nothing which shows the extent of his authority. We take it to be true that Martin's certificate was not evidence that Foster had complied with the terms of the treaty, in reference to which Martin had no authority. An official certificate is evidence only so far as the matter certified comes within the official duty or cognizance of the officer.

8th. The eighth error assigned is predicated on a bill of exceptions which was taken to the decision of the court in refusing to give the charges, twenty-four in number, requested by the counsel for defendant below. Many of these charges embrace substantially the same question, and some of them have been already answered. We shall briefly notice such as seem to have been considered as prominent, and not undertake to swell this opinion unnecessarily, by taking up each one.

It is insisted that Foster should have resided on the land claimed at the date of the treaty, or, at all events, when it was ratified. This position is believed to be erroneous. The provision in the

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

treaty is general, to each head of a family.    There is nothing by
which we can restrict its operation, or hold the provision to be on
condition that the applicant had then a residence or improvement.
It is true, that in directing how the location shall be made, it is
said the improvement must be included, but this is merely
directory, and may have been intended as much for the benefit
of the Indian as any thing else.    This is in accordance with the
construction which has been given to the treaty by the officers of
the government, and is consistent with justice, and liberality.—
The Cherokee treaty before referred to contains a similar provi-
sion, and has received a similar construction.    1 Yerger, 61, 63.
But as it became necessary for the Indian to reside upon the
land five years, it was of course necessary that he should com-
mence that residence, but at what precise time is left to be
gathered from a reasonable construction of the treaty.    If the
Indian had an improvement, of course that was to be included.
The privilege of becoming a citizen was intended to be given to
each head of a family who might register his name with the
agent within six months after the ratification of the treaty.    Thus
long he had, to make his election, and it seems to be a conse-
quence that this long he had to select his land or make his loca-
tion.    By the expiration of that time if he had made no location,
of course he could have no reserve.    This rule of construction
may seem to be arbitrary, but it is consistent with the meaning of
the treaty.

It is also insisted that Foster's reservation should have been so
located as to make but one tract.    This is true.    The reservation
mentioned in the treaty is a section of land to contain six hun-
dred and forty acres, to be bounded by sectional lines.    He was
not entitled to part of his reservation at one place, and the resi-
due at a distance from it, but he was entitled, by a fair construc-
tion, to his quantity of acres in different sections.    Suppose the
centre of his improvement had been on a corner, in such case he
would have been entitled to take his reserve out of the four sec-
tions.    But even if Foster's reservation does not conform to this
rule, and still has been effectually recognised by the government
before the rights of others accrued, we are not prepared to say
that it was not sufficient.

[Newman *v.* Doe *ex dem.* Harris & Plummer.]

There are some other points in this bill of exceptions which involve the consideration of defendant's title, concerning which we need say nothing, as his possession is a protection against any but a good title.

The ninth bill of exceptions was taken on overruling the motion for a new trial, and contains the substance of the testimony, and the reasons for a new trial at large. This we need not now notice; as, for the reasons already given, the judgment must be reversed, the cause remanded, and a *venire de novo* awarded.